**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| BOARD OF CERTIFICATION/ACCREDITATION INTERNATIONAL, INC.<br>10461 Mill Run Circle, Suite 1250<br>Owings Mills, Maryland  21117,<br><br>    *Plaintiff*,<br><br>  v.<br><br>ROBERT F. KENNEDY, Jr. in his official capacity as Secretary of Health and Human Services; MEHMET OZ, in his official capacity as Administrator for the Centers for Medicare and Medicaid Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES CENTERS FOR MEDICARE AND MEDICAID SERVICES,<br><br>    *Defendants*. | Civil Action No.: |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. Plaintiff Board of Certification/Accreditation International, Inc. ("BOC") files this action for judicial review of the federal defendants' unlawful and factually unfounded decision to withdraw, pursuant to 42 C.F.R. § 424.58(d)(4)(i), BOC's approval to serve as a Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS") accreditation organization ("AO").

## PREFATORY STATEMENT

2. This action is about an unlawful summary and immediate termination by the Centers for Medicare and Medicaid Services ("CMS") of a Maryland nonprofit's longstanding approval to accredit suppliers that provide Medicare beneficiaries nationwide with essential medical equipment and supplies.  For decades, BOC had been a trusted provider of accreditation

and credentialing services to participants in the DMEPOS industry.  In an apparent attempt to please the new leadership at CMS, however, CMS personnel on December 2, 2025, issued a termination notice premised on factual inaccuracies, misunderstandings of applicable regulations, and completely unreasonable and unsupported interpretations of certain provisions of a corrective action plan that CMS forced upon BOC in spring 2025. CMS's strategy with respect to that corrective action plan has now become clear: To use punitive restrictions and ambiguous requirements untethered to any legitimate regulatory purpose as a means of driving BOC out of business.  In doing so, CMS will have a "successful kill" to hold up to its new leadership as evidence of their progress in reducing "fraud, waste, and abuse" in the DMEPOS industry.  But CMS's stated reasons for terminating BOC's approval do not stand up to scrutiny.  If this Court does not intervene to prevent this unlawful termination, BOC will be forced to cease operating, terminate all of its employees, and permanently close its business in a matter of weeks.

## BACKGROUND

3.      BOC has provided nationwide certification and accreditation services for more than four decades.  From 2007 until December 2, 2025, as an AO approved by CMS, BOC evaluated and certified the facilities and practice of DMEPOS suppliers for compliance with applicable regulatory standards.

4.      The term "DMEPOS" refers to many types of commonly used medical equipment depended on by countless Medicare beneficiaries.  DMEPOS includes braces (knee, back, ankle, etc.), hospital equipment (beds, commodes, etc.), and other essential medical equipment (blood glucose monitors, insulin infusion pump supplies, heat and cold applications, neuromuscular stimulators, etc.).  To supply DMEPOS to Medicare beneficiaries, a DMEPOS supplier must be "accredited" by a CMS-approved AO.

5.      As part of that accreditation process an AO must "survey" a DMEPOS supplier on metrics identified by CMS, all of which are intended to verify that the supplier is a legitimate business that will operate or is currently operating in compliance with certain federal and state laws and regulations. Ultimately, the accreditation process seeks to ensure that patients obtain quality and medically necessary DMEPOS products.

6.      BOC has been a leader and innovator in DMEPOS accreditation since 2007, guided by its mission to assure patients, physicians, professional organizations, the public at large, and government agencies of the competence, professionalism, and safe practice environments of BOC-certified professionals and/or BOC-accredited businesses. BOC has met or exceeded CMS standards for as long as it has provided accreditation services. Throughout the nearly 17-year period that BOC was a "deemed" accrediting organization, BOC had received no concerns from CMS that BOC's operations were not in compliance with CMS's standards or in accordance with industry practice amongst its peer AOs.

7.      In April 2025, however, CMS came under new leadership. For reasons that remain unknown to BOC, CMS soon began a campaign to cast BOC as a representative of the fraud, waste, and abuse purportedly endemic in the DMEPOS industry and to drive BOC out of business.

8.      To that end, on April 21, 2025, a CMS representative issued a letter summarily withdrawing BOC's "deemed status" and terminated nationwide its ability to approve facilities seeking accreditation to sell DMEPOS based on wrongdoing by a single independent contractor who conducted surveys for BOC, primarily in Florida. The letter contained numerous false statements and inaccuracies.

9.      BOC objected to the summary and immediate termination of its approval without any prior notice as both substantively and procedurally improper. Substantively, because the

3

individual in question had ceased conducting surveys for BOC in May 2024 and because BOC had assisted in the criminal and civil investigations of the individual. Moreover, because the wrongdoing of one individual who rendered services for BOC in the past, centered in one state, did not warrant immediate revocation of BOC's approval to operate nationwide. Procedurally, because the individual's actions presented no immediate threat to the health and safety of Medicare beneficiaries or the public health at the time of issuance and because the notice was issued in the absence of any opportunity under the operative regulations for BOC to promptly have its defenses heard. Nevertheless, recognizing that termination would result in a catastrophic and near total loss of business, BOC had no viable choice but to accept and agree to a punitive Corrective Action Plan ("CAP") in exchange for reinstatement as a DMEPOS accrediting organization. *See* Exhibit 1 (hereinafter "CAP").

10.     BOC tried in good faith to adhere to the terms of the CAP. Less than five months after the parties agreed to the CAP, however, CMS issued to BOC a "Notice of Breach and Intent to Withdraw Approval," alleging numerous technical violations of the CAP and threatening to withdraw BOC's approval if BOC did not prove that it complied with certain provisions of the CAP or satisfactorily completed an opaque and poorly defined "cure" process. A second notice of the same kind soon followed.

11.     BOC responded promptly to these notices and tried to bring to CMS's attention that CMS's allegations of breach were based on a clear misunderstanding of the relevant facts and applicable regulations. Notwithstanding BOC's proposal of cures of the alleged breaches and its persistent requests to meet with CMS so that it could understand and address CMS's concerns, CMS refused to meet with BOC's representatives and provided terse and uninformative responses to inquiries regarding the status of the cure process.

12.     On December 2, 2025, BOC received notice that CMS had again summarily withdrawn its deemed status.

13.     The Administrative Procedure Act ("APA") protects those subject to an agency's jurisdiction from agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Without affording any real process, and based on a series of clear misunderstandings of fact and misinterpretations of applicable regulations, CMS has deprived BOC of the approval on which BOC depends for its viability as a business. Simply put, BOC will cease to exist if CMS's unlawful and unjustified revocation of BOC's approval is left undisturbed.  This Court should declare unlawful and vacate CMS's order withdrawing BOC's approval as a DMEPOS accrediting organization.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. § 1331 because BOC's claim for relief arises under the APA, 5 U.S.C. § 702.

15.     CMS's revocation of BOC's approval to serve as a DMEPOS AO is a final agency action subject to judicial review under 5 U.S.C. § 704.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because both BOC and CMS reside in the District of Maryland and a substantial part of the events giving rise to the lawsuit occurred within the District of Maryland.

## PARTIES

17.     Plaintiff BOC is a Maryland corporation engaged in the business of providing DMEPOS accreditation services pursuant to 42 C.F.R. § 424.58.

18.     Defendant Robert F. Kennedy, Jr. is Secretary of the Department of Health and Human Services ("HHS").  He is sued in his official capacity.

19.     Defendant Mehmet Oz is Administrator of CMS.  He is sued in his official capacity.

20.     Defendant HHS is a department of the executive branch of the federal government. HHS is an agency under 5 U.S.C. § 551(1).

21.     Defendant CMS is an agency within HHS.  CMS is an agency under 5 U.S.C. § 551(1).

## FACTUAL ALLEGATIONS

### I.    Regulatory Framework for Accreditation Organizations and DMEPOS Suppliers

22.     CMS regulates all suppliers of DMEPOS under authority granted by the Social Security Act and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003. CMS implements these requirements through 42 C.F.R. § 424.57(c), which establishes the standards that a DMEPOS supplier must meet in order to obtain and retain a Medicare billing number.

23.     Standard 22 expressly requires accreditation: "A supplier must be accredited by a CMS-approved AO in order to receive and retain a supplier billing number."  42 C.F.R. § 424.57(c)(22).

24.     CMS also publishes "DMEPOS Quality Standards" that define the operational, clinical, business, and product-specific requirements that suppliers must meet. *See* CMS, DMEPOS Quality Standards, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/DMEPOSQuality/DMEPOSQualBooklet-905709.html (last visited December 8, 2025).

25.     Accreditation is therefore a federal regulatory prerequisite for a DMEPOS supplier to participate in the Medicare program.

26.     CMS does not accredit DMEPOS suppliers on its own. Rather, CMS may (and does) designate an AO as a "deemed" organization for DMEPOS accreditation purposes.

27.     To obtain deemed status, an AO must demonstrate to CMS that its accreditation program: (1) meets or exceeds CMS's DMEPOS quality standards; (2) uses trained surveyors and a nationally consistent survey process; (3) maintains conflict-of-interest safeguards; (4) ensures effective monitoring, corrective action, and enforcement; (5) provides data and reporting to CMS; and (6) maintains procedures for denial, suspension, and revocation of accreditation.

28.     CMS-approved AOs perform a number of vital functions in the regulation of the DMEPOS industry.

29.     *First*, AOs certify the regulatory compliance of DMEPOS suppliers by conducting supplier "surveys."  During a survey, an AO evaluates whether the DMEPOS supplier under review complies with the DMEPOS quality standards pertaining to administration, product safety, intake, delivery, patient training, and follow-up, as well as the supplier standards set forth at 42 C.F.R. § 424.57(c).  In conducting the survey, the AO must apply CMS standards exactly and may not impose requirements inconsistent with or less stringent than CMS's own standards.

30.     *Second*, AOs are responsible for monitoring ongoing supplier compliance and reporting compliance information to CMS. Specifically, the AO must report to CMS any accreditation decisions, denials, suspensions, and revocations; require corrective action plans when deficiencies are identified; conduct follow-up or re-surveys as needed; maintain records and submit them to CMS upon request; and notify CMS promptly when a supplier no longer meets CMS standards. Failure to maintain accreditation is grounds for CMS to revoke a supplier's Medicare billing privileges.

31.     *Third*, AOs must ensure that suppliers meet requirements intended to reduce fraud, waste, and abuse.  For example, AOs must ensure that suppliers comply with the CMS rule requiring that a supplier receive a written order before billing Medicare for DMEPOS items.

4918-3368-1794, v. 4

II.    **BOC Has Provided Important Credentialing Services for Four Decades**

32.    BOC was founded in 1984 by Dr. Donald Fedder, a faculty member at the University of Maryland School of Pharmacy and a specialist in orthotics and prosthetics.

33.    BOC first certified Orthotists and Prosthetists and later broadened its certifications to other areas, including Orthotic Fitter, Mastectomy Fitter, and Durable Medical Equipment Specialist.  In the two decades after BOC's founding, thousands of individuals completed BOC's forty-hour introductory course and were listed as Registered Orthotic Fitters.  These practitioners recognized BOC's course and designation as a valuable part of their training for the practice of fitting prefabricated orthoses.

34.    In 2001, BOC expanded its mission beyond practitioner credentials by beginning to accredit orthotic and prosthetic facilities. Facility accreditation gave beneficiaries and referring physicians confidence that a facility met uniform and rigorous standards designed to support high-quality care.

35.    In recognition of BOC's expertise in facility accreditation, CMS in 2007 authorized BOC to provide accreditation services to DMEPOS suppliers nationwide.  In 2008, Congress enacted the Medicare Improvements for Patients and Providers Act, Pub. L. No. 110-275 (2008), which required nearly all DMEPOS suppliers to receive accreditation from a CMS-approved organization in order to bill Medicare for their products.

36.    As a result, for the first time, receiving DMEPOS accreditation was mandatory rather than optional for suppliers who billed Medicare for their products.  During the ensuing period of rapid and widespread regulatory change, BOC provided a vital service to suppliers by providing rigorous compliance evaluations, responsive customer support, and a structured accreditation pathway.

37.     Before CMS's December 2, 2025 termination of BOC's status as an AO, BOC was one of only eight CMS-approved DMEPOS AOs in the United States and oversaw active accreditations for thousands of DMEPOS facilities nationwide.  BOC operated a comprehensive accreditation program built on detailed surveys, policy reviews, and evidence-based standards. These standards ensure that suppliers operate lawfully and safely and maintain practices that protect patients—including those enrolled in Medicare—who depend on medically necessary equipment such as mobility aids, oxygen therapy equipment, prosthetics, orthotics, and diabetic supplies.

38.     For as long as there has been a need for DMEPOS accreditation, BOC has met that need according to the highest professional standards.  It has served and intends to continue serving as a trusted accrediting partner in the DMEPOS sector.  And it has served and intends to continue serving as a DMEPOS accrediting organization that meets and exceeds the expectations of CMS.

39.     For reasons not evident to BOC, however, CMS began in the spring of 2025 to take actions clearly calculated to end BOC's ability to provide accreditation services.  CMS's actions since then suggest that its purpose is not to improve the delivery of accreditation services—a process of improvement that BOC has consistently volunteered to collaborate in—but to manufacture purported shortcomings and failures on BOC's part as pretext to immediately terminate BOC's ability to provide any accreditation services at all.

## III.    CMS Summarily Withdraws BOC's Approval and Demands that BOC Agree to the CAP

40.     On April 21, 2025, without having provided any prior notice to BOC, CMS issued a Withdrawal of Approval Notice ("Withdrawal Notice") summarily terminating CMS's approval of BOC as a DMEPOS accrediting organization.  The Withdrawal Notice is appended as Exhibit 2.  The stated basis of the action was that Manuel Delgado, a former independent contractor who

conducted surveys for BOC, primarily in Florida, had accepted bribes from DMEPOS suppliers and provided surveying services[1] to entities owned by Delgado and his immediate family members. In particular, CMS claimed that, in light of Delgado's misconduct, "[a]ccreditation by [BOC] no longer adequately assure[d] that the suppliers of DMEPOS and other items and services are meeting the DMEPOS quality standards, and that failure to meet those requirements could jeopardize the health or safety of Medicare beneficiaries and could constitute a significant hazard to the public health[.]" Withdrawal Notice at 1.

41.    The Withdrawal Notice provided, in part: "You may request a reconsideration of this withdrawal of approval determination. The reconsideration rights for this determination are located at 42 C.F.R. § 424.58(e). This is an independent review conducted by a person not involved in the initial determination." Withdrawal Notice at 5.

42.    BOC responded promptly to the Withdrawal Notice. Through counsel, BOC explained that Delgado's work for BOC had ceased long before CMS issued the Withdrawal Notice; that Delgado had acted contrary to his contracts with BOC; and that Delgado's misconduct did not plausibly endanger the health or safety of Medicare beneficiaries or pose a hazard to the public health. *See* Exhibit 3 (emails between counsel for BOC and counsel for CMS) at 3.

43.    Counsel for BOC also informed CMS of its intent to pursue reconsideration of the revocation pursuant to 42 C.F.R. § 424.58(e) and as provided for in the Withdrawal Notice. *See* Exhibit 3 at 3.

44.    42 C.F.R. § 424.58 provides an AO with the option to request certain (inadequate) process if the AO is aggrieved by an action by CMS denying, removing, or declining to renew its

---

[1]    An accreditation surveyor is a professional who assesses the compliance of a prospective or existing accreditee for adherence with applicable CMS regulations.

deemed status.  *See* 42 C.F.R. § 424.58(e)(1) (providing that an "accreditation organization dissatisfied with a determination [by CMS] . . . *is entitled* to a reconsideration." (emphasis added)).

45.    In particular, if an accrediting organization requests reconsideration, CMS allows it "the opportunity for an informal hearing to be conducted by a hearing officer appointed by the Administrator of CMS[.]"  *Id.* § 424.58(e)(5).  However, 42 C.F.R. § 424.58(e) includes no requirement that CMS promptly set the hearing after an accrediting organization requests reconsideration.  The only timing requirements are that CMS provide 10 days' notice of the hearing before the scheduled date, and that the hearing officer issue his or her decision within 45 days of the hearing.  42 C.F.R. § 424.58(e)(6), (8).

46.    After BOC informed CMS that it intended to seek reconsideration of CMS's decision to withdraw BOC's approval as an AO, the regulations that govern CMS—as well as CMS's own Withdrawal Notice—required CMS to afford BOC the process defined at 42 C.F.R. § 424.58(e).

47.    Nevertheless, CMS denied BOC the process to which BOC was entitled.  In disregard of both 42 C.F.R. § 424.58(e) and its commitment in the Withdrawal Notice, CMS demanded that BOC agree to a CAP through which BOC would waive its right to seek reconsideration of CMS's revocation decision.  To that end, a CMS representative provided BOC with a proposed CAP on May 6, 2025, at 2:54 p.m., and stated that, unless BOC agreed to the CAP by the close of business the following day, CMS would notify DMEPOS suppliers that BOC was no longer an approved accrediting organization.

48.    BOC had no choice but to accede to CMS's demands and immediately agree to the CAP.  Any other course would have prevented BOC from continuing as a viable business.

49.    The CAP made BOC subject to five "Corrective Action Obligations."

50.     Of the five Corrective Action Obligations, only two are relevant to this dispute.

51.     *First*, the CAP prohibited BOC from accrediting or reaccrediting suppliers located in Florida, New York, California, and Texas ("Prohibited States"), except with respect to accreditations for which BOC had received payment before April 23, 2025.  *See* CAP § V.1.  Upon information and belief, CMS included New York, California, and Texas as Prohibited States not because of any specific concerns about BOC's operations in the states, but because those states, along with Florida, constitute approximately 50 percent of the DMEPOS market.

52.     Section V.1 of the CAP further provided that any accreditations in the Prohibited States for clients that had paid before April 23, 2025, could occur only after BOC submitted the accreditation package to CMS for its review and approval.

53.     *Second*, the CAP required BOC to provide various forms of notice to suppliers in the Prohibited States.  In particular, the CAP required that BOC publish on its website and "in all other materials" the following statement: "BOC is not currently accepting new accreditation or reaccreditation applications from suppliers operating in FL, TX, CA, and NY.  Suppliers in FL, TX, CA, and NY with active BOC-accreditation remain accredited and in good standing."  CAP § V.5.a.  The CAP further required BOC to send a CMS-approved letter to "every BOC-accredited supplier in the Prohibited States" stating that BOC could not provide further accreditation services, CAP § V.5.b, as well as a letter "to every supplier located in the Prohibited States who submitted payment to BOC on or before April 23, 2025, but has not yet been accredited," stating that BOC was unable "to provide . . . any further accreditation or reaccreditation services . . . beyond the scope of any current, active BOC-accreditation," CAP § V.5.c.

54.     The CAP provides that, within five days of receiving notice of a determination by CMS "that BOC . . . breached Section V.1 of the CAP by performing any accreditations or

reaccreditations for facilities in the Prohibited States outside of those who submitted payment on or before April 23, 2025," BOC must "demonstrate to [CMS's] satisfaction that BOC is in compliance with the obligations of Section V.1. of the CAP that [CMS] cited as the basis for the breach." CAP § VII.B. With respect to any other alleged breach, the CAP allows BOC a 30-day period during which to cure the violation or otherwise demonstrate compliance.

55.    After entering into the CAP on May 9, 2025, BOC timely met its obligations to provide all required information to CMS and to disseminate CMS-approved notices. BOC also endeavored, in good faith, to adhere to all terms of the CAP. On several occasions, BOC attempted to discuss its efforts with CMS to ensure that it was in compliance with all terms of the CAP.

56.    CMS refused to respond substantively, leaving BOC without guidance on how to comply with the poorly defined CAP provisions. The CAP did not explain the process by which BOC was supposed to process permitted accreditation and reaccreditation packages in the Prohibited States.

57.    Pursuant to this process, between the effective date of the CAP (May 8, 2025) and August 27, 2025, BOC uploaded to CMS hundreds of accreditation and reaccreditation packages for suppliers located in the Prohibited States. Despite BOC's submissions, CMS did not provide BOC with any guidance.

IV.    **CMS's First Notice of Breach and Intent to Withdraw Approval**

58.    Notwithstanding BOC's good faith efforts to comply with all terms of the CAP, and its repeated efforts to clarify its obligations thereunder, BOC received on September 2, 2025 a CMS "Notice of Breach and Intent to Withdraw Approval" dated August 27, 2025 ("First Breach Notice"). The First Breach Notice is attached as Exhibit 4.

59.    The First Breach Notice alleged four separate violations of the CAP.

60.    Of the four violations, only two are relevant to this dispute.

61.    As BOC explained to CMS in letters dated September 5, 2025 (Exhibit 5) and October 27, 2025 (Exhibit 6), each "breach" identified by CMS is entirely unrelated to the regulatory requirements for withdrawal of approval to serve as an AO, without factual basis, or based on a unsustainable interpretation of the CAP.

62.    *First*, CMS alleged that "BOC failed to submit accreditation/reaccreditation packages for applications in the Prohibited States . . . that were paid on or before April 23, 2025, to CMS for review and approval prior to BOC approval," in violation of CAP Section V.1.  First Breach Notice at 1.

63.    As an initial matter, BOC's alleged breach of this requirement—that BOC submit accreditation and reaccreditation packages to CMS for CMS pre-approval with respect to suppliers in the four Prohibited States, but not in the remaining 46 states—bears no intelligible relationship to the standard governing the withdrawal of an AO's approval.  In particular, CMS may only withdraw its approval of an AO if "the organization no longer adequately assures that the suppliers of DMEPOS and other items and services are meeting the DMEPOS quality standards, and that failure to meet those requirements could jeopardize the health or safety of Medicare beneficiaries and could constitute a significant hazard to public health."  42 C.F.R. § 424.58(d)(4)(i).

64.    Whether BOC waited for CMS approval of accreditation packages has no bearing on whether BOC adequately assures that suppliers meet the quality standards and whether BOC jeopardizes the health and safety of Medicare beneficiaries. CMS ordinarily has no role in pre-approving AO decisions, so there is no reasonable basis to conclude that BOC's conduct in approving accreditations prior to CMS approval fails to assure compliance with the quality standards and jeopardizes public safety.

65.     There was and is no basis for CMS's position that BOC's failure to wait for its approval of an accreditation decision in the four Prohibited States failed to guarantee the health and safety of Medicare beneficiaries. BOC's accreditation and reaccreditation process is substantially the same in all states. BOC's normal accreditation process in the other 46 states does not require CMS's pre-approval for BOC to issue an accreditation. Yet, CMS alleges that BOC's process in the Prohibited States fails to assure compliance with the quality standards and jeopardizes public safety simply because BOC failed to wait for CMS approval before issuing an accreditation. This disparate treatment of the same circumstances evidences CMS's unreasonable and illogical conclusion that BOC failed to adequately assure compliance with the quality standards and threatened public safety by not waiting for CMS approval before issuing an accreditation decision.

66.     Notably, CMS's assertion that BOC failed to submit accreditation and reaccreditation packages as required under the CAP is contrary to fact. BOC submitted hundreds of accreditation and reaccreditation packages to CMS for its review and approval, by publishing them to a CMS-BOC shared cloud storage drive on June 3, July 7, and August 6, 2025. Proof of BOC's submission of these accreditation packages in satisfaction of CAP Section V.1 is appended as Exhibit 7. CMS did not acknowledge receipt of those packages and gave no indication whatsoever that it was reviewing the packages that BOC had uploaded before issuing the First Breach Notice.

67.     *Second*, CMS alleged in the First Breach Notice that BOC breached the CAP because "BOC distributed notification letters that were not approved by CMS to suppliers" in Prohibited States, in violation of CAP Section V.5. First Breach Notice at 3. CMS's allegation is false.

68.     Section V.5.b requires that BOC send a letter denominated "Letter A" to "every BOC-accredited supplier located in the Prohibited States, other than those who are in the process of accrediting or reaccrediting with BOC and submitted payment to BOC on or before April 23, 2025."  Section V.5.c requires that BOC send a letter denominated "Letter B" to "every supplier located in the Prohibited States who submitted payment to BOC on or before April 23, 2025, but has not yet been accredited or reaccredited by BOC."

69.     BOC sent "Letter A" and "Letter B" after receiving the required pre-approval from CMS.  BOC submitted proof of its distribution of Letters A and B to CMS.  *See* Exhibit 8 (proof of CMS approval); Exhibit 9 (proof of distribution).

70.     The CAP did not prohibit BOC from sending other correspondence, in addition to "Letter A" and "Letter B," to the suppliers it accredits or formerly accredited.  Nevertheless, in the First Breach Notice, CMS asserted that BOC violated the CAP because it sent communications other than "Letter A" and "Letter B" to suppliers in the Prohibited States without first receiving CMS's approval.  This assertion has no basis in the CAP, or anywhere else.

71.     Further, whether BOC communicated to its customers without CMS approval has no bearing on the relevant standard for withdrawal of deemed status. CMS did not and cannot articulate a logical connection between BOC's alleged failure to receive CMS approval to communicate with its customers and the relevant standard for withdrawal in 42 C.F.R. § 424.58(d)(4)(i).  BOC's alleged transmission of letters to its customers without CMS approval does not logically relate to whether BOC adequately assures that the suppliers of DMEPOS and other items and services are meeting the DMEPOS quality standards, nor does it relate to the health and safety of Medicare beneficiaries or public health.

## V.    CMS's Second Notice of Breach and Intent to Withdraw

72.    On September 23, 2025, CMS issued a second and equally baseless Notice of Breach and Intent to Withdraw Approval ("Second Breach Notice"). The Second Breach Notice is appended as Exhibit 10.

73.    In the Second Breach Notice, CMS asserted that BOC violated Section V.1 of the CAP by engaging in unauthorized "accreditation activity," specifically, "approv[ing] new DMEPOS product categories" and "report[ing] new product codes for multiple DME suppliers. . . mid-accreditation." Second Breach Notice at 1, 2. As BOC demonstrated in a letter to CMS dated October 2, 2025, *see* Exhibit 11, CMS's assertion is incorrect for several reasons.

74.    As a threshold matter, approving new products within the scope of already-accredited product categories is not an "accreditation activity." AOs like BOC are approved by CMS to conduct surveys of DMEPOS suppliers to determine whether those suppliers are in compliance with quality standards. *See* 42 C.F.R. §§ 424.58(a), 424.58(b)(1). An AO performs "accreditation activity" when it conducts a survey to determine whether a supplier is in compliance with applicable regulations and standards. In contrast, an AO does not perform "accreditation activity" when it updates its records to reflect the full range of products that the supplier furnishes within an already-existing accreditation.

75.    To illustrate: BOC conducted a survey of Borbas Pharmacy Inc., on August 6, 2024, and accredited Borbas Pharmacy as a DMEPOS supplier on August 28, 2024—some nine months before the CAP's effective date. *See* Second Breach Notice at 17. Pursuant to this accreditation, Borbas Pharmacy supplied the following products: DM02 (commodes), DM05 (non-mail order blood glucose monitors), DM06 (mail-order blood glucose monitors), DM08 (heat and cold applications), DM09 (electric hospital beds), DM10 (manual hospital beds), DM11 (infrared

heating pad systems and supplies), DM13 (insulin infusion pumps), DM16 (neuromuscular stimulators), DM18 (pneumatic compression devices and supplies), DM22 (transcutaneous electrical nerve stimulation devices), DM25 (insulin infusion pump supplies), and DM26 (support surfaces), among others.

76.    All of these products are subject to Sections I and II of the DMEPOS quality standards promulgated by CMS. *See* CMS, DMEPOS Quality Standards, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/DMEPOSQuality/DMEPOSQualBooklet-905709.html    (last    visited December 8, 2025.  Under these standards, a DMEPOS supplier must demonstrate compliance in eleven different areas: (1) administration (including compliance with Medicare rules relating to the prevention of fraud); (2) financial management (including practices that ensure accurate billing); (3) human resources management (including hiring competent personnel to deliver equipment and train users); (4) consumer services (including providing clear instructions on use and maintenance of equipment); (5) performance management (including measurement of consumer services, billing practices, and adverse events); (6) product safety (including creation of a safety program and investigation of incidents); (7) information management (including maintenance of patient records in compliance with state and federal standards); (8) intake and assessment (including communication with the practitioner and review of patient records); (9) delivery and set-up (including timely delivery of equipment consistent with prescriber's order); (10) patient and caregiver training and instruction; and (11) follow-up (including patient and caregiver follow-up services).

77.    When BOC surveyed and later accredited Borbas Pharmacy, BOC confirmed that Borbas Pharmacy demonstrated compliance with all eleven quality standards and their subparts,

and accredited Borbas Pharmacy to supply all DMEPOS items subject to those standards.  Having received this accreditation, Borbas Pharmacy required no additional accreditation to supply patients with the products listed above and any other item subject to Sections I and II of the DMEPOS quality standards.

78.    On July 25, 2025, BOC updated its records to reflect that Borbas Pharmacy had begun to supply two additional products pursuant to its existing accreditation: DM12 (external infusion pumps) and DM24 (external infusion pump supplies).

79.    Because BOC had already certified Borbas's compliance with Sections I and II of the DMEPOS quality standards, the addition of these products did not require BOC to undertake any additional surveying or accrediting activity.  CMS nonetheless insisted—incorrectly—that BOC, by updating its records to reflect Borbas's current product list, had performed additional accreditation activity.

80.    This same misunderstanding was the basis of CMS's allegation that BOC performed prohibited accreditation activity with respect to seven other entities: Bump Health, Inc., Castle Hill Holdings, Inc., Enremed LLC, Heal Medical Supply LLC, On The Go Medical Supply LLC, Prime Care HME, Inc., and Star DME, Inc.  *See* Second Breach Notice at 17–18.  In particular, CMS incorrectly determined that BOC had performed substantive accreditation activity with respect to these entities when, in fact, BOC had already found that these suppliers met all required quality standards to supply all products on their product lists.

81.    With respect to five other suppliers identified by CMS—AC Northern Pharmacy; Amerimed Home Equipment LLC; Dynamic Medical, LLC; AJC Software, Inc.; and 18th Ave Care LLC—CMS's claim that BOC performed prohibited accreditation activity is belied by the

19

fact that BOC did not add any new products to these suppliers' profiles after the CAP's effective date.

82.    To illustrate:  CMS asserted that BOC added the following products to AC Northern Pharmacy's accreditation profile: DM02, DM05, DM06, DM11, DM22, DM23, M01, M05, and DM21.  *See* Second Breach Notice at 17.  Each of these products, however, were already active under AC Northern Pharmacy's existing accreditation *before* the CAP's effective date.

83.    Likewise, CMS asserted that BOC added DM18 to the accreditation profile of Amerimed Home Equipment LLC, that BOC added DM04, PD01, and S04 to the accreditation profile of Dynamic Medical, LLC, and that BOC added S01 to AJC Software, Inc.'s accreditation profile.  *See* Second Breach Notice at 17.  Again, however, each of these products was active under the respective supplier's accreditation before the effective date of the CAP.

84.    With respect to 18th Ave Care LLC, BOC adjusted its records to reflect that a product (DM23) included in the supplier's existing accreditation had been omitted in error from BOC's record of that accreditation.  By email of August 15, 2025, 18th Ave Care LLC informed BOC of this clerical error.  Because BOC had already made a determination regarding 18th Ave Care's compliance, BOC corrected the clerical error.  No products were added to 18th Ave Care's product list.

85.    CMS also asserted in the Second Breach Notice that BOC engaged in "accreditation activity" in breach of the CAP by approving "location changes" for its suppliers.  Second Breach Notice at 2.  As one example, CMS asserted that BOC wrongfully "approved" a location change for Abigails Medical Supplies, Inc., when it changed Abigails Medical's address from "2020 Camino Del Rio N St 105" to "2020 Camino Del Rio N St 300."  Second Breach Notice at 19.  In other words, CMS asserted that BOC had performed substantive accreditation activity, and thereby

breached the CAP, simply by changing the suite number in a supplier's address. But a change in address, for the same reasons described above, does not require an AO to perform a survey, and so does not constitute accreditation or reaccreditation activity.

86.    In sum, as with CMS's other allegations, there is no logical connection between BOC's alleged addition of products to supplier profiles and changes to supplier addresses and whether BOC no longer adequately assures that suppliers are meeting the DMEPOS quality standards or jeopardizes the health and safety of Medicare beneficiaries. CMS simply has not articulated any basis for the conclusion that BOC's alleged conduct has any bearing on the relevant withdrawal standard.

## VI.    CMS Issues a Summary Withdrawal After Ignoring Evidence Disproving the Violations Alleged

87.    In the three letters dated September 5, October 2, and October 27, 2025, respectively, BOC, through counsel, laid out to CMS the evident factual and legal deficiencies in the First and Second Breach Notices. *See* Exhibit 5 (Letter of September 5, 2025); Exhibit 6 (Letter of October 27, 2025); Exhibit 11 (Letter of October 2, 2025). CMS refused to provide any substantive response to these letters or to BOC's repeated requests for a meeting.

88.    Despite this lack of process, CMS issued a "Withdrawal of Approval Notice" on December 2, 2025, which terminated BOC's approval to act as a DMEPOS accrediting organization ("Second Withdrawal Notice"). The Second Withdrawal Notice is attached as Exhibit 12.

89.    The Second Withdrawal Notice alleges three violations very similar to those that were comprehensively addressed and disproved by BOC's submissions to CMS in September and October 2025.

90.    *First*, CMS reasserts that BOC violated Section V.1 of the CAP by "process[ing] and approv[ing] accreditation/reaccreditation applications for facilities in the Prohibited States paid on or before April 23, 2025, without submitting these packages for CMS for pre-approval review." Second Withdrawal Notice at 2.

91.    As explained above, BOC's alleged breach of this requirement—that BOC submit accreditation and reaccreditation packages to CMS for CMS pre-approval with respect to certain suppliers in the four Prohibited States, but not in the remaining 46 states—bears no intelligible relationship to the standard governing the withdrawal of an AO's approval. In particular, pursuant to 42 C.F.R. § 424.58(d)(4)(i), CMS may only withdraw its approval of an AO if "the organization no longer adequately assures that the suppliers of DMEPOS and other items and services are meeting the DMEPOS quality standards, and that failure to meet those requirements could jeopardize the health or safety of Medicare beneficiaries and could constitute a significant hazard to public health."

92.    Whether BOC waited for CMS approval of accreditation packages has no bearing on whether BOC no longer adequately assures that suppliers meet the quality standards and whether BOC jeopardizes the health and safety of Medicare beneficiaries. CMS ordinarily has no role in pre-approving AO decisions, so there is no reasonable basis to conclude that BOC's conduct in approving accreditations prior to CMS approval fails to assure compliance with the quality standards and jeopardizes public safety. Moreover, CMS gave no indication that it was actually reviewing the hundreds of accreditation and accreditation packages that BOC uploaded to the CMS-BOC shared cloud storage drive in the months before the CMS issued the First Breach Notice.

93.    There was and is no basis for CMS's position that BOC's failure to wait for its approval of an accreditation decision in the four Prohibited States failed to guarantee the health and safety of Medicare beneficiaries.  BOC's accreditation and reaccreditation process is substantially the same in all states. BOC's normal accreditation process in the other 46 states does not require CMS's pre-approval for BOC to issue an accreditation. Yet, CMS alleges that BOC's process in the Prohibited States fails to assure compliance with the quality standards and jeopardizes public safety simply because BOC failed to wait for CMS approval before issuing an accreditation. This disparate treatment of the same circumstances evidences CMS's unreasonable and illogical conclusion that BOC failed to adequately assure compliance with the quality standards and threatened public safety by not waiting for CMS approval before issuing an accreditation decision.

94.    CMS does not allege or sufficiently articulate that BOC's accreditation process in the Prohibited States failed to guaranteed the health and safety of Medicare beneficiaries. Rather, CMS is relying on alleged violations of a CAP in a vacuum, failing to consider or explain how the allege violation of the CAP reflects on the relevant standard in 42 C.F.R. § 424.58(d)(4)(i).

95.    As noted, BOC on three occasions submitted accreditation and reaccreditation packages to CMS for its review and approval, by publishing them to a shared cloud storage drive. Proof of BOC's submission of these accreditation packages in satisfaction of CAP Section V.1 is appended as Exhibit 7.  Moreover, BOC provided weekly notice to CMS of the suppliers that BOC had accredited and reaccredited after the effective date of the CAP.   BOC reasonably and in good faith believed that publication of these suppliers' accreditation and reaccreditation packages to CMS's shared cloud storage drive was consistent with the terms of the CAP.

96.    Upon receipt of the First Breach Notice (dated August 27, 2025)—which despite alleging a breach of Section V.1 still failed to make clear CMS's expectations regarding the process by which BOC was to submit accreditation and reaccreditation packages for suppliers in the Prohibited States—BOC worked in good faith to change its process to accord with its best guess as to CMS's preference (since CMS refused to clarify its expectations).  To that end, on September 12, 2025, Matt Gruskin, BOC's Chief Operating Officer, sent an email to all BOC employees involved in the accreditation and reaccreditation process, in which he advised BOC staff not to accredit suppliers in the Prohibited States until CMS provided its express approval.  *See* Exhibit 13.  This good faith attempt to meet CMS's expectations caused a significant disruption to BOC's business, because it prevented BOC from awarding accreditations to already-surveyed suppliers in Prohibited States until CMS approved or denied their accreditation packages. On at least three occasions *after* September 12, 2025, CMS approved the accreditation packages submitted to it through this process—in effect admitting that BOC's process was compliant with the CAP.

97.    Further demonstrating the arbitrary nature of the CAP provision requiring BOC to submit to CMS accreditation and reaccreditation packages from only four states, from the effective date of the CAP (May 9, 2025) through CMS's termination of BOC on December 2, 2025, BOC accredited or reaccredited 395 facilities across the country. For the 280 accreditations and reaccreditations granted by BOC in the non-prohibited states, CMS has not withdrawn a single one of BOC's accreditation decisions. Nor has CMS withdrawn the accreditation of any supplier it alleges was "wrongfully" accredited by BOC in the Prohibited States. Both of these facts prove that the CAP provision requiring pre-submission to CMS has no bearing on patient safety or public health—if BOC's accreditation of facilities in this timeframe jeopardized patient safety or public

health, CMS would have withdrawn these accreditations. Yet, all such accreditations remain active.

98.     *Second*, CMS asserts that BOC violated Section V.5 of the CAP by "issu[ing] notification letters (letters A and B under the RA/CAP) to suppliers that were not approved by CMS."  Second Withdrawal Notice at 3.  This assertion, too, is demonstrably false:  BOC sent compliant letters A and B to suppliers in the Prohibited States.  To the extent that CMS alleges that BOC violated Section V.5 of the CAP by sending *other* letters to suppliers in the Prohibited States, this alleged breach is without basis in the CAP, which does not prohibit BOC from sending letters other than Letter A and Letter B to suppliers in the Prohibited States.

99.     Also, as addressed above, BOC's communication to its customers has no bearing on the relevant standard for withdrawal. It can't be said that BOC failed to adequately assure supplier compliance with the quality standards because BOC sent a communication to its customers that was not approved by CMS.

100.     *Third*, CMS reasserts that BOC violated Section V.1 of the CAP by "approv[ing] new DMEPOS product categories and location changes for multiple DMEPOS suppliers in the Prohibited States . . . after the RA/CAP effective date."  Second Withdrawal Notice at 4–5.  In so alleging, CMS simply repeats the untenable assertion, first advanced in the Second Breach Notice, that administrative updates to BOC's record systems amount to substantive accreditation activity. CMS provides no explanation for its decision to treat administrative updates as substantive accreditation activity.

101.     Likewise, there is no logical connection between the above alleged CAP breach and the relevant withdrawal standard. It cannot be said that BOC failed to adequately assure supplier compliance with the quality standards simply because BOC added products and revised addresses

for its accredited suppliers. These are ordinary administrative processes necessary to ensure that the suppliers remained compliant with CMS requirements.

## COUNT I
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious Agency Action

102.    BOC realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

103.    CMS's revocation of BOC's approval to serve as a DMEPOS accrediting organization is subject to judicial review because it is a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

104.    The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 705(2)(A).

105.    "An agency action is arbitrary and capricious if it rests upon a factual premise that is unsupported by substantial evidence." *FiberTower Spectrum Holdings, LLC v. F.C.C.*, 782 F.3d 692, 700 (D.C. Cir. 2015) (quoting *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 315 (D.C. Cir. 1992)).  An agency action also  "qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024).

106.    An agency may act contrary to law and therefore arbitrarily and capriciously when it defies its own regulations.  *United States v. Caceres*, 440 U.S. 741, 754 (1979); *see also Orellana v. Bondi*, 141 F.4th 560, 566 (4th Cir. 2025) ("[W]hen an agency fails to follow its own procedures or regulations, that agency's actions are generally invalid.") (citation omitted).

107.    Each of the three bases for withdrawal asserted by CMS is either unsupported by substantial evidence, contrary to law, or based on an unreasonable construction of the CAP.

108.    *First*, CMS withdrew BOC's approval to serve as a DMEPOS accrediting organization because BOC accredited and reaccredited suppliers in Prohibited States before submitting to CMS these suppliers' accreditation and reaccreditation packages. This basis for withdrawal is arbitrary and capricious because BOC's alleged failure to submit these packages to CMS for its review does not remotely implicate any of the factors governing the withdrawal of an AO's approval.  *See* 42 C.F.R. § 424.58(d)(4)(i) (providing that "[1] accreditation by the organization no longer adequately assures that suppliers of DMEPOS and other items and services are meeting DMEPOS quality standards, and that failure to meet those requirements could jeopardize the health or safety of Medicare beneficiaries and could constitute a significant hazard to the public health; or [2] the accreditation organization has failed to meet its obligations with respect to application or reapplication procedures.").

109.    To illustrate: from the effective date of the CAP (May 9, 2025) until CMS's termination of BOC on December 2, 2025, BOC accredited or reaccredited 395 facilities across the country.  CMS has not countermanded a single one of BOC's 280 accreditation decisions with respect to suppliers in the non-prohibited states.  Nor has CMS withdrawn the accreditation of any supplier it alleges was "wrongfully" accredited by BOC in the Prohibited States.  In fact, CMS has *approved* at least three of BOC's proposed accreditations since September 12, 2025, in effect admitting that BOC's process for accreditation is sound and consistent with patient safety and public health.

110.    *Second*, CMS's assertion that BOC violated Section V.5 of the CAP by "issu[ing] notification letters (letters A and B under the RA/CAP) that were not approved by CMS" is unsupported by substantial evidence and without a reasonable explanation.  Second Withdrawal Notice at 3.  BOC received the approval required under Section V.5 of the CAP and sent the

approved letters A and B to suppliers in the Prohibited States. Although CMS asserts that BOC violated Section V.5 of the CAP by issuing to suppliers *other* letters containing content that had not received CMS approval, CMS entirely fails to justify its position that the CAP required BOC to receive CMS pre-approval before sending letters other than Letter A and Letter B.

111. Moreover, CMS again fails to explain how BOC's letters to its customers implicate the factors governing withdrawal under 42 C.F.R. § 424.58(d)(4)(i).

112. *Third*, CMS's assertion that BOC violated Section V.1 of the CAP by approving product category additions and location changes for DMEPOS suppliers in Prohibited States rests an unreasonable construction of the term "accreditation activity." Section V.1 prohibits BOC from accrediting or reaccrediting suppliers in the Prohibited States without CMS's prior approval unless the supplier had previously paid BOC. This section of the CAP prohibits nothing else. Under no reasonable construction does Section V.1 of the CAP prohibit BOC from ""updating its records to reflect a supplier's current location or inventory.

113. In sum, every violation alleged by CMS is contrary to law, factually unfounded, or based on an unreasonable construction of the CAP. CMS's revocation is therefore arbitrary and capricious.

114. BOC is entitled to and requests that this Court grant an order declaring unlawful and vacating CMS's order withdrawing BOC's approval to act as a DMEPOS accrediting organization.

## COUNT II
### U.S. Constitution, Fifth Amendment
### Deprivation of Procedural Due Process

115. BOC realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

116.    The Fifth Amendment of the United States Constitution provides, in part: "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

117.    BOC's approval to provide DMEPOS accreditation services, which CMS may revoke only if it makes the findings required under 42 C.F.R. § 424.58(d)(4), is a property interest protected under the Fifth Amendment. *See Gilbert v. U.S. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 306 F. Supp. 3d 776, 786 (D. Md. 2018) (quoting *Perry v. Sinderman*, 408 U.S. 593, 601 (1972)) ("A government benefit, such as a license, confers a 'property interest for due process purposes' if there are specific rules that claimants for that benefit 'may invoke at a hearing' where their entitlement to that benefit will be determined." (additional quotation marks omitted)).

118.    CMS failed to afford BOC the process required under the Fifth Amendment, because "[d]ue process, at a minimum, requires that a person be given notice of impending action and afforded a hearing." *Richardson v. Town of Eastover*, 922 F.2d 1152, 1159 (4th Cir. 1991). BOC was not afforded an opportunity to contest CMS's revocation decision at a hearing—or, indeed, in any other way.

119.    The process afforded to BOC was also deficient when evaluated under the balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

120.    *First*, "the private interest . . . affected by the official action" is substantial: CMS's revocation eliminates BOC's ongoing viability as a business. *Id.*

121.    *Second*, "the risk of an erroneous deprivation of [this] interest through the procedures used" by CMS is significant, because CMS's error-strewn notices of breach evidence a failure to understand basic facts about BOC's operations or the meaning of several provisions of

the CAP.  *Id.*  And the "probable value . . . of additional or substitute procedural safeguards" is great, because additional process will allow BOC to correct CMS's clear misunderstandings.  *Id.*

122.    *Third*, "the fiscal and administrative burdens that . . . additional or substitute procedural requirement[s] would entail," *id.*, will work no harm to CMS, because the process requested by BOC is the same process that CMS itself has committed to providing, *see* 42 C.F.R. § 424.58(e).

123.    BOC is entitled to and requests that this Court grant an order declaring unlawful and vacating CMS's order withdrawing BOC's approval to act as a DMEPOS accrediting organization.

<u>**COUNT III**</u>
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious Agency Action—Failure to Consider Countervailing Evidence**

124.    BOC realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

125.    An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem[.]"  *Sierra Club v. Dep't of Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

126.    BOC responded promptly and diligently to the First and Second Breach Notices by submitting three letters to CMS setting forth (1) evidence disproving the facts on which several of which CMS's breach allegations rest, (2) demonstrating to CMS that its breach allegations depended on an unreasonable and unsupported construction of the CAP, CAP and (3) offering and implementing cures for several of the alleged CAP breaches.  BOC repeatedly requested an

opportunity to discuss its responses with CMS.  CMS failed to provide a substantive reply to any of BOC's three letters and refused BOC's repeated requests for a meeting.

127.    By failing to provide a substantive reply to any of BOC's three letters, failing to consider BOC's offered and implemented cures, and refusing BOC's repeated requests for a meeting to discuss BOC's compliance with the CAP, CMS "entirely failed to consider an important aspect of the problem[.]"  *Sierra Club*, 899 F.3d at 293.  Likewise, by failing to explain how the three alleged basis for the withdrawal have any logical connection to the relevant withdrawal standard, CMS failed to consider an important aspect of the problem. Indeed, the administrative record will establish that CMS entirely failed to consider seriously *any* aspect of the problem.

128.    CMS's decision to withdraw BOC's approval to serve as a DMEPOS accrediting organization resulted from CMS's failure to consider seriously the evidence and arguments establishing BOC's compliance with the CAP and BOC's commitment to ensuring supplier compliance with the quality standards.  CMS's withdrawal was therefore procedurally defective and arbitrary and capricious.

129.    BOC is entitled to and requests that this Court grant an order declaring unlawful and vacating CMS's order withdrawing BOC's approval to act as a DMEPOS accrediting organization.

## PRAYER FOR RELIEF

WHEREFORE, BOC respectfully requests that this Court:

1.    Declare that defendants CMS, HHS, Robert F. Kennedy, Jr., and Mehmet Oz acted arbitrarily and capriciously and contrary to law in withdrawing BOC's approval to serve as a DMEPOS accrediting organization pursuant to 42 C.F.R. § 424.58(d)(4)(i);

2.    Vacate CMS's order withdrawing BOC's approval to serve as a DMEPOS accrediting organization pursuant to 42 C.F.R. § 424.58(d)(4)(i);

3.    Enjoin defendants CMS, HHS, Robert F. Kennedy, Jr., and Mehmet Oz from implementing, enforcing, or otherwise giving effect to CMS's order withdrawing BOC's approval to serve as a DMEPOS accrediting organization pursuant to 42 C.F.R. § 424.58(d)(4)(i);

4.    Remand CMS's order withdrawing BOC's approval to serve as a DMEPOS accrediting organization to CMS with instructions to meet its statutory obligations under the APA and 42 C.F.R. § 424.58;

5.    Award BOC its reasonable attorneys' fees and costs; and

6.    Award such additional relief as the interests of justice may require.


Dated:  December 16, 2025                      Respectfully submitted,

                                               */s/ B. Summer Hughes Niazy*
                                               James P. Ulwick (Fed. Bar No. 00536)
                                               Christopher C. Jeffries (Fed. Bar No. 28587)
                                               B. Summer Hughes Niazy (Fed. Bar No. 06362)
                                               Matthew A. Haven (Fed. Bar No. 18602)
                                               Bruno Babij (Fed. Bar No. 31160)
                                               KRAMON & GRAHAM, P.A.
                                               750 East Pratt Street, Suite 1100
                                               Baltimore, Maryland 21202
                                               julwick@kg-law.com
                                               cjeffries@kg-law.com
                                               sniazy@kg-law.com
                                               mhaven@kg-law.com
                                               bbabij@kg-law.com
                                               Telephone: (410) 752-6030
                                               Facsimile: (410) 539-1269

                                               *Attorneys for Plaintiff*

4918-3368-1794, v. 4

## <u>VERIFICATION</u>

I declare under the penalty of perjury that the foregoing is true and correct.

This 16th day of December, 2025.


Judi Knott
Chief Executive Officer
Board of Certification/Accreditation
International, Inc.