**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

BOARD OF
CERTIFICATION/ACCREDITATION
INTERNATIONAL, INC.

*Plaintiff*,

v.

ROBERT F. KENNEDY, Jr. in his official
capacity as Secretary of Health and Human
Services; MEHMET OZ, in his official capacity
as Administrator for the Centers for Medicare
and Medicaid Services; UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; UNITED STATES CENTERS FOR
MEDICARE AND MEDICAID SERVICES,

*Defendants*.

Civil Action No.: 1:25-cv-4150

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND
<u>STAY PURSUANT TO 5 U.S.C. § 705</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 4

    I.    Regulatory Framework for AOs and DMEPOS Suppliers ................................. 4

    II.   BOC Has Provided Important Credentialing Services for Four Decades .......................... 5

    III.  CMS Summarily Withdraws BOC's Approval and Demands that BOC Accede to the Terms of a Corrective Action Plan ............................................................. 7

    IV.  BOC Receives Two Baseless Notices of Breach from CMS .......................... 10

    V.   CMS Issues a Summary Withdrawal After Ignoring Evidence Disproving the Violations Alleged ................................................................. 13

LEGAL STANDARD........................................................................................................... 14

ARGUMENT ...................................................................................................................... 14

    I.    BOC Is Likely to Succeed on the Merits ........................................................ 14

        A.   Count I:  The Revocation Order is Arbitrary and Capricious ...................... 14

        B.   Count II:  The Revocation Order is a Deprivation of Procedural Due Process in Violation of the Fifth Amendment............................................ 20

        C.   Count III:  The Revocation Order is Arbitrary and Capricious Because CMS Issued It Without Considering Countervailing Evidence or Arguments Presented by BOC ...... 23

    II.   BOC Will Suffer Immediate and Irreparable Harm Absent Relief.................... 24

    III.  The Balance of Equities and Public Interest Favor Relief.............................. 26

CONCLUSION.................................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

*Loper Bright Ents. v. Raimondo,*
603 U.S. 369 (2024) ........................................................................................ 18

*Mathews v. Eldridge,*
424 U.S. 319 (1976) ........................................................................................ 25

*Maryland v. U.S. Dep't of Agric.,*
770 F. Supp. 3d 779 (D. Md. 2025) ............................................................... 28

*Mills v. Dist. of Columbia,*
571 F.3d 1304 (D.C. Cir. 2009) ..................................................................... 28

*Miranda v. Garland,*
34 F.4th 338 (4th Cir. 2022) .......................................................................... 17

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) .......................................................................................... 26

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land,*
915 F.3d 197 (4th Cir. 2019) ......................................................................... 27

*Nken v. Holder,*
556 U.S. 418 (2009) ........................................................................................ 17

*Ohio v. EPA,*
603 U.S. 279 (2024) ................................................................................. 26, 27

*Orellana v. Bondi,*
141 F.4th 560 (4th Cir. 2025) ........................................................................ 18

*Perry v. Sinderman,*
408 U.S. 593 (1972) ........................................................................................ 23

*Platone v. U.S. Dep't of Lab.,*
548 F.3d 322 (4th Cir. 2008) ......................................................................... 18

*Reed v. Goertz,*
598 U.S. 230 (2023) ........................................................................................ 23

*Richardson v. Town of Eastover,*
922 F.2d 1152 (4th Cir. 1991) ................................................................. 23, 24

*Roe v. Dep't of Def.,*
947 F.3d 207 (4th Cir. 2020) ......................................................................... 17

ii

*Salomon & Ludwin, LLC v. Winters*,
  150 F.4th 268 (4th Cir. 2025) ........................................................27

*Semmes Motors, Inc. v. Ford Motor Co.*,
  429 F.2d 1197 (2d Cir. 1970) ........................................................27

*Sierra Club v. Dep't of Interior*,
  899 F.3d 260, (4th Cir. 2018) ........................................................26

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
  988 F.3d 690 (4th Cir. 2021) ....................................................27, 28

*Turner v. Rogers*,
  564 U.S. 431 (2011) ........................................................25

*United States v. Caceres*,
  440 U.S. 741 (1979) ........................................................18

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ........................................................29

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ................................................17, 29, 30

**Statutes and Other Authorities:**

42 C.F.R. § 424.57(c)............................................................................7, 8
42 C.F.R. § 424.57(c)(22) ...................................................................... 7
42 C.F.R. § 424.58............................................................................ 11
42 C.F.R. § 424.58(a)........................................................................ 15
42 C.F.R. § 424.58(b)(1)................................................................15, 20
42 C.F.R. § 424.58(d)(4)...................................................................... 24
42 C.F.R. § 424.58(d)(4)(i) .................................................................. 18
42 C.F.R. § 424.58(e) ................................................................... passim
42 C.F.R. § 424.58(e)(1) ...................................................................... 11
42 C.F.R. § 424.58(e)(1)–(7) ................................................................ 24
42 C.F.R. § 424.58(e)(5) ...................................................................... 11

5 U.S.C. § 702 ............................................................................ 28
5 U.S.C. § 705 ............................................................................ 17

Congress enacted the Medicare Improvements for Patients
and Providers Act, Pub. L. No. 110-275 (2008) ...................................... 9

iii

DMEPOS Accreditation Requirements, 90 Fed. Reg. 55342, 55607 (Dec. 2, 2025)..... passim

Fifth Amendment of the United States Constitution ....................................................... passim

Fourteenth Amendment of the United States Constitution ............................................... 23, 24

Social Security Act and the Medicare Prescription Drug, Improvement,
and Modernization Act of 2003, Pub. L. No. 108-173 (2003) ................................................ 7

iv

## **INTRODUCTION**

This action is about an unlawful summary termination by the Centers for Medicare and Medicaid Services ("CMS") of a Maryland nonprofit's longstanding approval to certify the regulatory compliance of, or "accredit," businesses that supply essential medical equipment and supplies to Medicare beneficiaries nationwide.  For decades, Board of Certification/Accreditation International, Inc. ("BOC") had been a trusted provider of accreditation and credentialing services to participants in the durable medical supply industry.  And since 2007, BOC had served as one of only eight accreditation organizations ("AO") approved by CMS to accredit suppliers of Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS").  AOs are approved by CMS to evaluate suppliers of DMEPOS, determine whether the suppliers meet CMS regulatory standards, and, if appropriate, award an accreditation required for a supplier to participate in the Medicare program.  In short, for nearly twenty years, CMS entrusted BOC to stand in CMS's shoes, implementing and enforcing CMS requirements to ensure that Medicare beneficiaries obtained safe and medically necessary DMEPOS.

In an apparent attempt to please the new leadership at CMS, however, CMS personnel have since spring 2025 pursued a campaign to make BOC an example of the "fraud, waste, and abuse" purportedly endemic in the DMEPOS industry.  This campaign began in April 2025 when CMS summarily terminated BOC's "deemed status" with no prior notice and then forced BOC to enter into a punitive "corrective action plan" (CAP).  *See* Exhibit 1 (hereinafter "CAP").  It has culminated in the final agency action that gives rise to this lawsuit: CMS's issuance on December 2, 2025 of a notice terminating BOC's approval to serve as an AO.

This action wholly ignores applicable law, is premised on factual inaccuracies, and relies on unreasonable interpretations of certain provisions in the CAP.  CMS's issuance of the notice

has made the purpose of the CAP clear: To use punitive restrictions and ambiguous requirements untethered to any legitimate regulatory purpose as a means of driving BOC out of business. In doing so, CMS personnel will have a "successful kill" to hold up to new leadership as evidence of their progress in reducing "fraud, waste, and abuse." But CMS's stated reasons for terminating BOC do not stand up under scrutiny. If this Court does not intervene to prevent CMS's unlawful revocation to take effect, BOC will be forced to cease operating, terminate all of its employees, and permanently close its business in a matter of weeks.

The Court should grant this motion for preliminary relief because BOC is likely to succeed on the merits. As to its substantive claims under the Administrative Procedure Act, BOC is likely to prevail because CMS's termination of BOC's approval to serve as an AO was arbitrary and capricious and contrary to law. By law, CMS is permitted to terminate an AO's approval only if it finds that the AO fails to assure that suppliers of DMEPOS are meeting quality standards, and that suppliers' failure to meet these quality standards could jeopardize the health or safety of Medicare beneficiaries and constitute a significant hazard to the public health. CMS terminated BOC's status as an AO based on three alleged violations of a corrective action plan, each of which is entirely unrelated to the preconditions CMS must satisfy for termination. For this reason alone, CMS's termination of BOC was arbitrary and capricious and contrary to law under the Administrative Procedure Act.

The revocation was also procedurally defective. Before terminating BOC's approval, CMS was required by regulation to provide BOC with the right to request reconsideration before an independent reviewer. This review process would have afforded BOC the opportunity to present evidence and argument through counsel. Nevertheless, CMS twice deprived BOC of the process BOC was due by regulation: once in May 2025 when CMS forced BOC either to go out of business

or forgo its reconsideration rights by agreeing to a corrective action plan, and again when CMS terminated BOC's approval on December 2, 2025 without staying enforcement until the reconsideration process was complete.

BOC meets all other requirements for preliminary relief. First, BOC will suffer immediate and irreparable harm if the Court does not at least stay enforcement of CMS's termination. Absent relief, BOC will be out of business by February 2026. The deprivation of BOC's right to due process under the Fifth Amendment and BOC's permanent loss of income constitute immediate and irreparable harm in any event. Second, the balance of the equities favors BOC because suppliers of DMEPOS that have already applied to BOC for accreditation or reaccreditation will suffer delays in obtaining them, and suppliers with existing accreditations issued by BOC will be unable to receive support during the lifetime of their existing accreditations without reapplying for accreditation with another AO. Third, the public interest favors relief because, by prohibiting BOC from providing accreditation services, CMS has eliminated one of only eight entities responsible for overseeing suppliers of DMEPOS and ensuring that these suppliers meet quality standards and provide safe and medically necessary equipment. Ultimately, any harm caused by interruptions to the business of DMEPOS suppliers will devolve on Medicare beneficiaries and cause reduced quality of care and delays in obtaining medically necessary supplies.

To ensure that neither BOC nor the public suffer irreparable harm as a result of CMS's ill-considered actions, the Court should grant this motion and stay enforcement of CMS's termination of BOC's approval until this case is fully adjudicated on the merits.

# BACKGROUND

### I.    Regulatory Framework for AOs and DMEPOS Suppliers

CMS regulates all suppliers of DMEPOS under authority granted by the Social Security Act and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173 (2003).  CMS implements these requirements through 42 C.F.R. § 424.57(c), which establishes the standards that a DMEPOS supplier must meet in order to obtain and retain a Medicare billing number.  Standard 22 expressly requires accreditation: "A supplier must be accredited by a CMS-approved AO in order to receive and retain a supplier billing number."  42 C.F.R. § 424.57(c)(22).  CMS also publishes "DMEPOS Quality Standards" that define the operational, clinical, business, and product-specific requirements that suppliers must meet. *See* CMS, DMEPOS Quality Standards, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/DMEPOSQuality/DMEPOSQualBooklet-905709.html (last visited December 15, 2025).  Accreditation is a federal regulatory prerequisite for a DMEPOS supplier to receive reimbursement from Medicare.

CMS does not accredit DMEPOS suppliers on its own.  Rather, CMS may (and does) designate an AO as a "deemed" organization for DMEPOS accreditation purposes.  To obtain deemed status, an AO must demonstrate to CMS that its accreditation program: (1) ensures that suppliers meet or exceed CMS's DMEPOS quality standards; (2) uses trained surveyors and a nationally consistent survey process; (3) maintains conflict-of-interest safeguards; (4) ensures effective monitoring, corrective action, and enforcement; (5) provides data and reporting to CMS; and (6) maintains procedures for denial, suspension, and revocation of accreditation.

CMS-approved AOs perform a number of vital functions in the regulation of the DMEPOS industry.  *First*, AOs certify the regulatory compliance of DMEPOS suppliers by conducting

supplier "surveys."  During a survey, an AO evaluates whether the DMEPOS supplier under review complies with the DMEPOS quality standards pertaining to administration, product safety, intake, delivery, patient training, and follow-up, as well as the supplier standards set forth at 42 C.F.R. § 424.57(c).  In conducting the survey, the AO must apply CMS standards exactly and may not impose requirements inconsistent with or less stringent than CMS's own standards.

*Second*, AOs are responsible for monitoring ongoing supplier compliance and reporting compliance information to CMS. Specifically, the AO must report to CMS any accreditation decisions, denials, suspensions, and revocations; require corrective action plans when deficiencies are identified; conduct follow-up or re-surveys as needed; maintain records and submit them to CMS upon request; and notify CMS promptly when a supplier no longer meets CMS standards. Failure to maintain accreditation is grounds for CMS to revoke a supplier's Medicare billing privileges.

*Third*, AOs must ensure that suppliers meet requirements intended to reduce fraud, waste, and abuse.  For example, AOs must ensure that suppliers comply with the CMS rule requiring that a supplier receive a written order before billing Medicare for DMEPOS items.

## II.    BOC Has Provided Important Credentialing Services for Four Decades

BOC was founded in 1984 by Dr. Donald Fedder, a faculty member at the University of Maryland School of Pharmacy and a specialist in orthotics and prosthetics.  BOC first provided the certified Orthotist and Certified Prosthetist credentials and later broadened its offerings to include the Orthotic Fitter, Mastectomy Fitter, and Durable Medical Equipment Specialist credentials.  In the two decades after BOC's founding, thousands of individuals completed BOC's forty-hour introductory course and were certified as Orthotic Fitters, Prosthetists, Orthotists, Pedorthists, Mastectomy Fitters, and Durable Medical Equipment Specialists.  These practitioners recognized BOC's course and designation as a valuable part of their training for the practice of

5

fitting prefabricated orthoses and prostheses. In 2001, BOC expanded its mission beyond practitioner credentials by beginning to accredit orthotic and prosthetic supplier facilities. Facility accreditation gave patients and referring physicians confidence that a facility met uniform and rigorous standards designed to support high-quality care.

In recognition of BOC's expertise in facility accreditation, CMS in 2007 authorized BOC to provide accreditation services to DMEPOS suppliers nationwide. In 2008, Congress enacted the Medicare Improvements for Patients and Providers Act, Pub. L. No. 110-275 (2008), which required nearly all DMEPOS suppliers to receive accreditation from a CMS-approved organization in order to bill Medicare for their products. As a result, for the first time, receiving DMEPOS accreditation was mandatory rather than optional for suppliers who billed Medicare for their products. During the ensuing period of rapid and widespread regulatory change, BOC provided a vital service to suppliers by providing rigorous compliance evaluations, responsive customer support, and a structured accreditation pathway.

Before CMS's December 2, 2025 termination of BOC's status as an AO, BOC oversaw active accreditations for thousands of DMEPOS facilities nationwide. BOC operated a comprehensive accreditation program built on detailed surveys, policy reviews, and evidence-based standards. These standards ensure that suppliers operate lawfully and safely and maintain practices that protect patients—including those enrolled in Medicare—who depend on medically necessary equipment such as mobility aids, oxygen therapy equipment, prosthetics, orthotics, and diabetic supplies. For as long as there has been a need for DMEPOS accreditation, BOC has met that need according to the highest professional standards. It has served and intends to continue serving as a trusted accrediting partner in the DMEPOS sector. And it has served and intends to continue serving as a DMEPOS AO that meets and exceeds the expectations of CMS.

For reasons not evident to BOC, however, CMS began in the spring of 2025 to take actions clearly calculated to end BOC's ability to provide accreditation services. CMS's actions since then suggest that its purpose is not to improve the delivery of accreditation services—a process of improvement that BOC has consistently volunteered to collaborate in—but to manufacture purported shortcomings and failures on BOC's part as pretext to immediately terminate BOC's ability to provide any accreditation services at all.

### III.    CMS Summarily Withdraws BOC's Approval and Demands that BOC Accede to the Terms of a Corrective Action Plan

On April 21, 2025, without providing any prior notice to BOC, CMS issued a Withdrawal of Approval Notice ("Withdrawal Notice") summarily terminating CMS's approval of BOC as a DMEPOS accrediting organization. The Withdrawal Notice is appended as Exhibit 2. The stated basis of the action was that Manuel Delgado, a former independent contractor who conducted surveys for BOC, primarily in Florida, had accepted bribes from DMEPOS suppliers and provided surveying services[1] to entities owned by Delgado and his immediate family members. In particular, CMS claimed that, in light of Delgado's misconduct, "[a]ccreditation by [BOC] no longer adequately assure[d] that the suppliers of DMEPOS and other items and services are meeting the DMEPOS quality standards, and that failure to meet those requirements could jeopardize the health or safety of Medicare beneficiaries and could constitute a significant hazard to the public health[.]" Withdrawal Notice at 1. The Withdrawal Notice provided, in part: "You may request a reconsideration of this withdrawal of approval determination. The reconsideration rights for this determination are located at 42 C.F.R. § 424.58(e). This is an independent review conducted by a person not involved in the initial determination." Withdrawal Notice at 5.

---

[1] An accreditation surveyor is a professional who assesses the compliance of a prospective or existing accreditee for adherence with applicable CMS regulations.

4929-6874-5081, v. 10

BOC responded promptly to the Withdrawal Notice. BOC explained that Delgado had not performed a survey for BOC since May 2024, well before the Withdrawal Notice was issued; that Delgado had acted contrary to his contracts with BOC and concealed his affiliations with certain suppliers from BOC; and that Delgado's past fraud did not plausibly endanger the health or safety of Medicare beneficiaries or pose a hazard to the public health at the time the Withdrawal Notice was issued. Exhibit 3 (emails between counsel for BOC and counsel for CMS) at 3.

BOC also informed CMS of its intent to pursue reconsideration of the revocation pursuant to 42 C.F.R. § 424.58(e) and as provided for in the Withdrawal Notice. *See* Exhibit 3 at 3. 42 C.F.R. § 424.58 provides an AO with the option to request certain process if the AO is aggrieved by the denial, revocation, or non-renewal of its deemed status by CMS. *See* 42 C.F.R. § 424.58(e)(1) (providing that an "[AO] dissatisfied with a determination [by CMS] . . . *is entitled* to a reconsideration." (emphasis added)). In particular, if an accrediting organization requests reconsideration, CMS allows it "the opportunity for an informal hearing to be conducted by a hearing officer appointed by the Administrator of CMS[.]" *Id.* § 424.58(e)(5).

After BOC informed CMS that it intended to seek reconsideration of CMS's decision to withdraw BOC's approval as an AO, the regulations that govern CMS—as well as CMS's own Withdrawal Notice—required CMS to afford BOC the process defined at 42 C.F.R. § 424.58(e). Nevertheless, CMS denied BOC the process to which BOC was entitled. In disregard of both 42 C.F.R. § 424.58(e) and its commitment in the Withdrawal Notice, CMS demanded that BOC agree to a CAP through which BOC would waive its right to seek reconsideration of CMS's revocation decision. To that end, a CMS representative provided BOC with a proposed CAP on May 6, 2025, at 2:54 p.m., and stated that, unless BOC agreed to the CAP by the close of business the following day, CMS would notify DMEPOS suppliers that BOC was no longer an approved AO. Exhibit 3

at 1.  BOC had no choice but to accede to CMS's demands and immediately agree to the CAP.
Any other course would have prevented BOC from continuing as a viable business.

The CAP made BOC subject to five "Corrective Action Obligations."  Of the five
Corrective Action Obligations, only two are relevant to this dispute.

*First*, the CAP prohibited BOC from accrediting or reaccrediting suppliers located in
Florida, New York, California, and Texas ("Prohibited States"), except with respect to
accreditations for which BOC had received payment before April 23, 2025.  *See* CAP § V.1.
Although not clear to BOC at the time it signed the CAP, CMS seems to interpret Section V.1 of
the CAP to prohibit BOC from accrediting suppliers in the Prohibited States that paid on or before
April 23, 2025, until *after* CMS reviewed and approved accreditation packages BOC sent to CMS.

*Second*, the CAP required BOC to provide three forms of notice to suppliers in the
Prohibited States.  In particular, the CAP required that BOC publish on its website and "in all other
materials" the following statement: "BOC is not currently accepting new accreditation or
reaccreditation applications from suppliers operating in FL, TX, CA, and NY.  Suppliers in FL,
TX, CA, and NY with active BOC-accreditation remain accredited and in good standing."  CAP
§ V.5.a.  The CAP further required BOC to send two CMS-approved letters to "every BOC-
accredited supplier in the Prohibited States" stating that BOC could not provide further
accreditation services, CAP § V.5.b, as well as a letter "to every supplier located in the Prohibited
States who submitted payment to BOC on or before April 23, 2025, but has not yet been
accredited," stating that BOC was unable "to provide . . . any further accreditation or
reaccreditation services . . . beyond the scope of any current, active BOC-accreditation," CAP
§ V.5.c.

The CAP affords BOC a right to cure any alleged violations of its terms. It provides that, within five days of receiving notice of a determination by CMS "that BOC . . . breached Section V.1 of the CAP by performing any accreditations or reaccreditations for facilities in the Prohibited States outside of those who submitted payment on or before April 23, 2025," BOC must "demonstrate to [CMS's] satisfaction that BOC is in compliance with the obligations of Section V.1. of the CAP that [CMS] cited as the basis for the breach." CAP § VII.B. With respect to any other alleged breach, the CAP allows BOC a 30-day period during which to cure the violation or otherwise demonstrate compliance.

After entering into the CAP on May 9, 2025, BOC timely met its obligations to provide all required information to CMS and to disseminate CMS-approved notices. BOC also endeavored, in good faith, to adhere to all terms of the CAP.

## IV.     BOC Receives Two Baseless Notices of Breach from CMS

On September 2, 2025, BOC received a "Notice of Breach and Intent to Withdraw Approval" issued by CMS and dated August 27, 2025 ("First Breach Notice"). The First Breach Notice is attached as Exhibit 4. The First Breach Notice alleged four separate violations of the CAP. Of the four violations, only two are relevant to this dispute. As BOC explained to CMS in letters dated September 5, 2025 (Exhibit 5) and October 27, 2025 (Exhibit 6), each of these two allegations of breach is baseless.

*First*, CMS alleged that "BOC failed to submit accreditation/reaccreditation packages for applications in the Prohibited States . . . that were paid on or before April 23, 2025, to CMS for review and approval prior to BOC approval," in violation of CAP Section V.1. First Breach Notice at 1. CMS failed to explain, however, how this alleged breach—BOC's purported failure to submit

the accreditation and reaccreditation packages of suppliers in the Prohibited States to CMS for CMS pre-approval—related at all to the standard governing the withdrawal of an AO's approval.

*Second*, CMS alleged in the First Breach Notice that BOC breached the CAP because "BOC distributed notification letters that were not approved by CMS to suppliers" in Prohibited States, in violation of CAP Section V.5.  First Breach Notice at 3.  As BOC explained to CMS in the letter of October 27, 2025, CMS's allegation is misconceived.  Section V.5.b requires that BOC send a letter denominated "Letter A" to "every BOC-accredited supplier located in the Prohibited States, other than those who are in the process of accrediting or reaccrediting with BOC and submitted payment to BOC on or before April 23, 2025."  Section V.5.c requires that BOC send a letter denominated "Letter B" to "every supplier located in the Prohibited States who submitted payment to BOC on or before April 23, 2025, but has not yet been accredited or reaccredited by BOC."

In compliance with Section Section V.5, BOC sent "Letter A" and "Letter B" after receiving the required pre-approval of the content of the letters from CMS.  BOC submitted proof of its distribution of Letters A and B to CMS.  *See* Exhibit 7 (proof of CMS's approval); Exhibit 8 (proof of distribution by BOC).    The distribution of these letters fully satisfied BOC's obligations under Section V.5:  the CAP did not prohibit BOC from sending other correspondence, in addition to "Letter A" and "Letter B," to the suppliers it accredits or formerly accredited.  Nevertheless, in the First Breach Notice, CMS asserted that BOC violated the CAP because it sent communications other than "Letter A" and "Letter B" to suppliers in the Prohibited States without first receiving CMS's approval.  This assertion had no basis in the CAP, or anywhere else.

On September 23, 2025, CMS issued a second and equally baseless Notice of Breach and Intent to Withdraw Approval ("Second Breach Notice").  The Second Breach Notice is appended

as Exhibit 9. In the Second Breach Notice, CMS asserted that BOC violated Section V.1 of the CAP by engaging in unauthorized "accreditation activity," specifically, "approv[ing] new DMEPOS product categories" and "report[ing] new product codes for multiple DME suppliers. . . mid-accreditation." Second Breach Notice at 1, 2. As BOC demonstrated in a letter to CMS dated October 2, 2025, *see* Exhibit 10, CMS's assertion was and is baseless.

As a threshold matter, approving new products within the scope of already-accredited product categories is not an "accreditation activity." AOs like BOC are approved by CMS to conduct surveys of DMEPOS suppliers to determine whether those suppliers are in compliance with quality standards. *See* 42 C.F.R. §§ 424.58(a), 424.58(b)(1). An AO performs "accreditation activity" when it conducts a survey to determine whether a supplier is in compliance with applicable regulations and standards. 42 C.F.R. 424.58(b)(1) ("Accreditation activity" occurs when an accrediting organization such as BOC "survey[s] suppliers for compliance with the DMEPOS quality standards[.]"). In contrast, an AO does not perform "accreditation activity" when it updates its records to reflect the full range of products that the supplier furnishes within an already-existing accreditation.

CMS also asserted in the Second Breach Notice that BOC engaged in "accreditation activity" in breach of the CAP by approving "location changes" for its suppliers. Second Breach Notice at 2. As one example, CMS asserted that BOC wrongfully "approved" a location change for Abigails Medical Supplies, Inc., when it changed Abigails Medical's address from "2020 Camino Del Rio N St 105" to "2020 Camino Del Rio N St 300." Exhibit 6 at 19. In other words, CMS asserted that BOC had performed substantive accreditation activity, and thereby breached the CAP, simply by changing the suite number in a supplier's address. A change in address, for

12

the same reasons described above, does not require an AO to perform a survey, and so does not constitute accreditation or reaccreditation activity.

**V.    CMS Issues a Summary Withdrawal After Ignoring Evidence Disproving the Violations Alleged**

In the three letters dated September 5, October 2, and October 27, 2025, respectively, BOC, through counsel, laid out to CMS the evident factual and legal deficiencies in the First and Second Breach Notices.  *See* Exhibit 5 (Letter of September 5, 2025); Exhibit 6 (Letter of October 27, 2025); Exhibit 10 (Letter of October 2, 2025).  CMS refused to provide any substantive response to these letters or to BOC's request for a meeting.  *See* Exhibit 11 (illustrating CMS's failure to provide substantive response).  Despite this lack of process, CMS issued a "Withdrawal of Approval Notice" on December 2, 2025, which terminated BOC's approval to act as a DMEPOS accrediting organization ("Second Withdrawal Notice").  The Second Withdrawal Notice is attached as Exhibit 12.  The Second Withdrawal Notice alleges three violations very similar to those that were comprehensively addressed and disproved by BOC's submissions to CMS in September and October 2025.

*First*, CMS reasserts that BOC violated Section V.1 of the CAP by  "process[ing] and approv[ing] accreditation/reaccreditation applications for facilities in the Prohibited States paid on or before April 23, 2025, without submitting these packages for CMS for pre-approval review."  Second Withdrawal Notice at 2.  *Second*, CMS asserts that BOC violated Section V.5 of the CAP by "issu[ing] notification letters (letters A and B under the RA/CAP) to suppliers that were not approved by CMS."  Second Withdrawal Notice at 3.  And, *third*, CMS reasserts that BOC violated Section V.1 of the CAP by "approv[ing] new DMEPOS product categories and location changes for multiple DMEPOS suppliers in the Prohibited States . . . after the RA/CAP effective date."  Second Withdrawal Notice at 4–5.

As explained *infra*, the grounds for revocation advanced by CMS in the Second Withdrawal Notice are defective both substantively and procedurally.

## LEGAL STANDARD

"A party 'seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)). The final two factors—balance of the equities and public interest—"merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "The standards for granting a TRO . . . and a § 705 stay are essentially the same" as the standard for granting a preliminary injunction. *Am. Fed. of State, Cnty. and Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 771 F. Supp. 3d 717, 792 (D. Md. 2025) (citations omitted).

## ARGUMENT

### I.   BOC Is Likely to Succeed on the Merits

A plaintiff seeking preliminary relief must demonstrate "clear[ly]" that he is likely to succeed on the merits of his claims at trial—but he "need not establish a certainty of success." *Jensen v. Md. Cannabis Admin.*, 151 F.4th 169, 175 (4th Cir. 2025). BOC is likely to succeed on the merits of all three counts asserted in the Complaint.

#### A.   Count I:  The Revocation Order is Arbitrary and Capricious

"An agency action is arbitrary and capricious if it rests upon a factual premise that is unsupported by substantial evidence," *FiberTower Spectrum Holdings, LLC v. F.C.C.*, 782 F.3d 692, 700 (D.C. Cir. 2015) (quoting *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309,

315 (D.C. Cir. 1992)), or if it "is premised on a legal error," *Doe v. Noem*, 152 F.4th 272, 287 (1st Cir. 2025). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Platone v. U.S. Dep't of Lab.*, 548 F.3d 322, 326 (4th Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). When reviewing an agency's conclusions for legal error, courts must "apply[] their own judgment," without affording any deference to the agency's own interpretation of the law. *Loper Bright Ents. v. Raimondo*, 603 U.S. 369, 392 (2024). An agency may act contrary to law and therefore arbitrarily and capriciously when it defies its own regulations. *United States v. Caceres*, 440 U.S. 741, 754 (1979); *see also Orellana v. Bondi*, 141 F.4th 560, 566 (4th Cir. 2025) ("[W]hen an agency fails to follow its own procedures or regulations, that agency's actions are generally invalid.") (citation omitted).

Each of the bases for revocation identified by CMS in the Second Withdrawal Notice is either unsupported by substantial evidence, contrary to law, or based on an unreasonable construction of the CAP .

*First*, CMS asserts that BOC violated Section V.1 of the CAP by "process[ing] and approv[ing] accreditation/reaccreditation applications for facilities in the Prohibited States paid on or before April 23, 2025, without submitting these packages to CMS for pre-approval review." Second Withdrawal Notice at 2. This purported basis for revocation is arbitrary and capricious because BOC's alleged breach—failing to submit accreditation and reaccreditation packages to CMS for CMS pre-approval with respect to suppliers in the four Prohibited States—bears no intelligible relationship to the standard governing the withdrawal of an AO's approval. *See* 42 C.F.R. § 424.58(d)(4)(i) (permitting withdrawal of an AO's approval only if "the organization no longer adequately assures that the suppliers of DMEPOS and other items and services are meeting the DMEPOS quality standards, and that failure to meet those requirements could jeopardize the

health or safety of Medicare beneficiaries and could constitute a significant hazard to public health.").

Indeed, CMS's own conduct proves that BOC's alleged failure to wait for CMS approval before accrediting suppliers in the Prohibited States has no bearing on patient safety or public health. BOC's accreditation and reaccreditation process was substantially the same in all states. From the effective date of the CAP through December 2, 2025, BOC accredited or reaccredited 395 facilities across the country, 115 of which were located in the Prohibited States. Starting in April 2025, BOC submitted to CMS the accreditation and reaccreditation packages for all of these suppliers. As a result, CMS has had for months every single piece of information relevant to whether BOC adequately assured beneficiary safety and public health when accrediting suppliers in Prohibited States. But CMS has not countermanded a single one of BOC's decisions to accredit these suppliers.

In fact, in recent weeks, CMS has *approved* BOC's accreditation decisions for at least three suppliers in the Prohibited States. By accepting BOC's proposed accreditations in the Prohibited States, CMS has effectively admitted that BOC's processes (1) adequately assure that suppliers of DMEPOS are meeting DMEPOS quality standards, (2) do not jeopardize the health or safety of Medicare beneficiaries, and (3) do not constitute a significant hazard to the public health.

*Second*, BOC did not violate Section V.5 of the CAP by "issu[ing] notification letters (letters A and B under the RA/CAP) that were not approved by CMS." Second Withdrawal Notice at 3. Section V.5 mandates that BOC receive pre-approval from CMS with respect to two letters: a "Letter A" sent to "every BOC-accredited supplier in the Prohibited States" stating that BOC could not provide further accreditation services, CAP § V.5.b, and a "Letter B" "to every supplier located in the Prohibited States who submitted payment to BOC on or before April 23, 2025, but

has not yet been accredited," stating that BOC was unable "to provide . . . any further accreditation or reaccreditation services . . . beyond the scope of any current, active BOC-accreditation," CAP § V.5.c.  There is no question that BOC received the approvals required under Section V.5 or that it sent the approved letters to suppliers in the Prohibited States.  To the extent that CMS asserts that BOC should have received pre-approval of letters other than Letter A and Letter B, CMS's assertion is without basis in the CAP.

In any event, BOC's alleged issuance of unapproved letters has no bearing on patient health and safety and has not created a hazard to public health.  Insofar as CMS's termination is based on this alleged breach, it is also contrary to law.

*Third*, BOC did not violate Section V.1 of the CAP by updating its records to reflect changes in the addresses of and products offered by suppliers in the Prohibited States.  *See* Second Withdrawal Notice at 4–5.  CMS posits that this routine administrative activity with respect to existing accreditations is "accreditation activity" prohibited by the CAP.  "Accreditation activity," however, occurs when an accrediting organization such as BOC "survey[s] suppliers for compliance with the DMEPOS quality standards[.]"  42 C.F.R. 424.58(b)(1).  The changes CMS complains of did not involve evaluation of a supplier's compliance with the DMEPOS quality standards; they were administrative updates to the accreditation profiles of suppliers whose compliance with applicable standards BOC had already surveyed and certified.

To illustrate, CMS asserts that BOC breached the CAP by permitting Borbas Pharmacy Inc. ("Borbas Pharmacy") to add two items to its product list.  BOC conducted a survey of Borbas Pharmacy on August 6, 2024, and accredited Borbas Pharmacy as a DMEPOS supplier on August 28, 2024—some nine months before the CAP's effective date.  *See* Second Withdrawal Notice at 27.  Pursuant to this accreditation, Borbas Pharmacy supplied the following products: DM02

17

(commodes), DM05 (non-mail order blood glucose monitors), DM06 (mail-order blood glucose monitors), DM08 (heat and cold applications), DM09 (electric hospital beds), DM10 (manual hospital beds), DM11 (infrared heating pad systems and supplies), DM13 (insulin infusion pumps), DM16 (neuromuscular stimulators), DM18 (pneumatic compression devices and supplies), DM22 (transcutaneous electrical nerve stimulation devices), DM25 (insulin infusion pump supplies), and DM26 (support surfaces), among others.

Critically, all of these products are subject to Sections I and II of the DMEPOS quality standards promulgated by CMS. *See* CMS, DMEPOS Quality Standards, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/DMEPOSQuality/DMEPOSQualBooklet-905709.html (last visited December 15, 2025). Under these standards, a DMEPOS supplier must demonstrate compliance in eleven different areas: (1) administration (including compliance with Medicare rules relating to the prevention of fraud); (2) financial management (including practices that ensure accurate billing); (3) human resources management (including hiring competent personnel to deliver equipment and train users); (4) consumer services (including providing clear instructions on use and maintenance of equipment); (5) performance management (including measurement of consumer services, billing practices, and adverse events); (6) product safety (including creation of a safety program and investigation of incidents); (7) information management (including maintenance of patient records in compliance with state and federal standards); (8) intake and assessment (including communication with the practitioner and review of patient records); (9) delivery and set-up (including timely delivery of equipment consistent with prescriber's order); (10) patient and caregiver training and instruction; and (11) follow-up (including patient and caregiver follow-up services).

When BOC surveyed and later accredited Borbas Pharmacy, BOC confirmed that Borbas Pharmacy demonstrated compliance with all eleven quality standards and their subparts, and accredited Borbas Pharmacy to supply all DMEPOS items subject to those standards. Having received this accreditation, Borbas Pharmacy required no additional accreditation to supply patients with the products listed above or *any other* item subject to Sections I and II of the DMEPOS quality standards.

On July 25, 2025, BOC updated its records to reflect that Borbas Pharmacy had begun to supply two additional products pursuant to its existing accreditation: DM12 (external infusion pumps) and DM24 (external infusion pump supplies). *See* Second Withdrawal Notice at 27. Because BOC had already certified Borbas's compliance with Sections I and II of the DMEPOS quality standards, the addition of these products did not require BOC to undertake any additional surveying or accrediting activity. CMS nonetheless insisted—incorrectly—that BOC, by updating its records to reflect Borbas's current product list, had performed additional accreditation activity. CMS's insistence that this administrative activity is "accreditation activity" prohibited by Section V.1 rests on an unreasonable and erroneous construction of the CAP.

The administrative changes CMS complains of also do not implicate patient health or public safety and, therefore, cannot serve as the basis of revocation. CMS has, by its conduct, acknowledged as much. BOC has, for months, provided CMS with information reflecting changes to suppliers' addresses and product lists. Yet, CMS has not withdrawn the accreditations of these suppliers or prohibited them from supplying the products "wrongfully" added to their supply lists. If, as CMS insists, these suppliers posed a threat to public health or patient safety, CMS would have withdrawn their accreditations or directed them to remove the "new" products from their approved lists. CMS has not done so.

Nor, in any event, could CMS credibly find that a change in address or the addition of a product poses a threat to public health or patient safety. As explained above, BOC had already surveyed each of the suppliers identified on CMS's breach list and determined that these suppliers meet DMEPOS quality standards. The products alleged by CMS to have been "newly" added were and are subject to the same quality standards as the products existing in these suppliers' accreditation profiles *before* the CAP's effective date. To the extent that these standards ensure the safety of products offered by accredited suppliers before the CAP's effective date—a premise that CMS appears to accept—they necessarily ensure the safety of similar products first offered *after* the CAP's effective date.

## B.  Count II:  The Revocation Order is a Deprivation of Procedural Due Process in Violation of the Fifth Amendment

The Fifth Amendment of the United States Constitution provides, in part: "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "A procedural due process claim consists of two elements: (i) deprivation by [government] action of a protected interest in life, liberty, or property, and (ii) inadequate [government] process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023). BOC is likely to succeed in proving both elements of its procedural due process claim.

*First*, BOC's approval to provide DMEPOS accreditation services is a property interest protected under the Fifth Amendment. The Court of Appeals for the Fourth Circuit has recognized that a "license issued by the state which can be suspended or revoked only upon a showing of cause creates a property interest protected by the Fourteenth Amendment."[2] *Richardson v. Town*

---

[2] The Supreme Court recently observed that, because the Fifth and Fourteenth Amendments were adopted at different times, "questions may arise in which different constructions and applications of their provisions may be proper." *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 13 (2025). There is no reason to think that procedural due process is one such question, and the Court's comment, standing alone, does not disturb the well-settled understanding that "[t]he

*of Eastover*, 922 F.2d 1152, 1156 (4th Cir. 1991); *see also Gilbert v. U.S. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 306 F. Supp. 3d 776, 786 (D. Md. 2018) (quoting *Perry v. Sinderman*, 408 U.S. 593, 601 (1972)) ("A government benefit, such as a license, confers a 'property interest for due process purposes' if there are specific rules that claimants for that benefit 'may invoke at a hearing' where their entitlement to that benefit will be determined." (additional quotation marks omitted)).  BOC's approval is effectively a license issued by CMS that authorizes BOC to perform DMEPOS accreditation services.  And it "can be suspended or revoked only upon a showing of cause" because, under 42 C.F.R. § 424.58(d)(4), CMS may withdraw approval only after making the findings specified in that regulation.  BOC's approval is therefore a property interest protected under the Due Process Clause of the Fifth Amendment.

*Second*, the process afforded to BOC by CMS has been manifestly inadequate.  "Due process, at a minimum, requires that a person be given notice of impending action and afforded a hearing."  *Richardson*, 922 F.2d at 1159.  The applicable regulations confirm this point.  Pursuant to 42 C.F.R. § 424.58(e), AOs such as BOC are "entitled to a reconsideration" if their status as an AO is terminated.  This regulation requires that entities in BOC's position be afforded "an opportunity for an informal hearing to be conducted by a hearing officer"; an "opportunity to present, in writing and in person, evidence or documentation to refute [CMS's] determination"; and the opportunity to have authorized representatives, technical advisors, and legal counsel present at the informal hearing.  42 C.F.R. § 424.58(e)(1)–(7).

CMS twice denied BOC the due process required by regulation.  *First*, even though BOC had expressed its intent to seek reconsideration as required under the regulation, CMS provided

---

procedural due process protections under the Fifth and Fourteenth Amendments are the same[.]" *English v. Dist. of Columbia*, 717 F.3d 968, 972 (D.C. Cir. 2013).

BOC with a proposed CAP on May 6, 2025, at 2:54 p.m., and stated that, unless BOC agreed to the CAP by the close of business the following day, CMS would notify DMEPOS suppliers that BOC was no longer an approved accrediting organization.

That is duress, not due process. Under 42 C.F.R. § 424.58(e), CMS has no authority to force an AO to choose between availing itself of the required due process and going out of business. For the regulation to have any meaning, an AO must be able to pursue reconsideration while remaining in business. Here, if BOC had elected to pursue the process it was due, it would have been out of business by the time the reconsideration process was complete. This is a straightforward deprivation of due process.

*Second*, CMS denied BOC due process by issuing its December 2, 2025 termination notice and refusing to stay enforcement so that BOC could pursue reconsideration. Again, if enforcement of CMS's termination is not stayed—which it has not been here—BOC will be out of business within a matter of weeks. By refusing to stay enforcement of the December 2, 2025 termination, CMS has again deprived BOC of the due process it is owed by regulation.

The conclusion would be no different if the Court were to engage in the balancing contemplated by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976)—an exercise in any event obviated by CMS's failure to provide even a minimum of process. Under *Mathews*, a court deciding what process is due must consider:

> (1) the nature of the private interest that will be affected, (2) the comparative risk of an erroneous deprivation of that interest with and without additional or substitute procedural safeguards, and (3) the nature and magnitude of any countervailing interest in not providing additional or substitute procedural requirements.

*D.B. v. Cardall*, 826 F.3d 721, 742 (4th Cir. 2016) (quoting *Turner v. Rogers*, 564 U.S. 431, 444–45 (2011)). Each of these factors confirms the inadequacy of the process afforded to BOC by CMS.

The "private interest that will be affected" is nothing less than the continuing existence of a 41-year-old business. *Id.* This interest should be accorded the greatest weight. The "risk of an erroneous deprivation of that interest . . . without additional" process is significant, because CMS's existing procedures provide no opportunity for BOC to correct CMS's misunderstandings of fact and unsound interpretations of the CAP. *Id.* And CMS's "countervailing interest in not providing additional" process is minimal, *id.*, because the additional process requested by BOC is just that CMS is already required to provide under 42 C.F.R. § 424.58(e).

### C. Count III: The Revocation Order is Arbitrary and Capricious Because CMS Issued It Without Considering Countervailing Evidence or Arguments Presented by BOC

An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem[.]" *Sierra Club v. Dep't of Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). That is, an agency action must not only be substantively reasonable, but also "reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024).

CMS has failed to provide *any* explanation—let alone a reasonable one—for its conclusion that revocation was warranted notwithstanding the countervailing evidence and arguments presented by CMS. BOC responded promptly and diligently to the First and Second Breach Notices by submitting three letters to CMS setting forth (1) evidence disproving the facts on which several of which CMS's breach allegations rest and (2) demonstrating to CMS that its remaining breach allegations depend on an unreasonable construction of the CAP. *See supra*. BOC repeatedly requested an opportunity to discuss its responses with CMS. But CMS failed to provide a substantive reply to any of BOC's three letters, refused BOC's repeated requests for a meeting, and issued a notice of revocation that did little more than restate three of the alleged violations disproved in BOC's intervening submissions.

An agency "cannot simply ignore an important aspect of the problem." *Ohio*, 603 U.S. at 293. Here, however, CMS's silence indicates that it ignored *all* important aspects of the problem. Such an unexplained and unreasoned decision is necessarily arbitrary and capricious.

## II.    BOC Will Suffer Immediate and Irreparable Harm Absent Relief

"The permanent loss of a business, with its corresponding goodwill, is a well-recognized form of irreparable injury." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 719 (4th Cir. 2021); *accord Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 278 n.7 (4th Cir. 2025) (noting that "'[p]ermanent loss of customers to a competitor or the loss of goodwill' constitutes irreparable injury"). To be sure, "economic losses . . . recoverable at the end of litigation" do not in general "qualify as irreparable for the purposes of preliminary relief." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 218 (4th Cir. 2019) (citations omitted). But economic loss is irreparable when it "threaten[s] a party's very existence by . . . driving it out of business before litigation concludes." *Id.*

In *Federal Leasing, Inc. v. Underwriters at Lloyd's*, the plaintiff Federal Leasing ("Federal") sought and received a preliminary injunction directing the defendant insurance underwriters to pay debts that threatened to cause Federal's bankruptcy. 650 F.2d 495, 499 (4th Cir. 1981). The Court of Appeals for the Fourth Circuit affirmed the grant of preliminary relief, reasoning that Federal did "not seek . . . the mere acceleration of a money debt otherwise compensable in damages," but, instead, "to preserve its existence and business." *Id.* at 500. The "right to continue a business is not measurable entirely in monetary terms," the Court explained; Federal's purpose was to preserve its business, "not to live on income from a damages award." *Id.* (quoting *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970)).

BOC's business consists almost entirely of providing accreditation services to DMEPOS suppliers. *See* Knott Decl. ¶ 11. Without CMS's approval to provide these services, BOC will

suffer a catastrophic and permanent loss of business and goodwill. *Id.* In only a matter of weeks BOC will be required to lay off almost one-third of its workforce. *Id.* ¶ 16. And, absent relief, it will be required in less than two months to cease operating altogether. *Id.* ¶ 17. This is exactly the kind of "threatened collapse" that warrants emergency relief. *Steves & Sons*, 988 F.3d at 719.

Even if the Court concludes—counterfactually—that the collapse of BOC's business is not sufficiently imminent to warrant preliminary relief, there are two other bases on which the Court may conclude that CMS's unlawful revocation of BOC's approval to provide accreditation services will cause irreparable injury.

*First*, it is axiomatic "that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 345 (4th Cir. 2021) (quoting *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)). CMS's revocation deprived BOC of the process due under the Fifth Amendment. This deprivation is an irreparable injury warranting preliminary relief.

*Second*, CMS's sovereign immunity to a suit for damages means that any economic injury sustained by BOC—even an economic injury that does not result in complete collapse—is irreparable. *See Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 500 (D. Md. 2020) ("Because the government is protected by sovereign immunity and no monetary damages are available, . . . severe economic losses can qualify as irreparable harm."); *see also Maryland v. U.S. Dep't of Agric.*, 770 F. Supp. 3d 779, 813 (D. Md. 2025) (same). BOC's economic losses are beyond any dispute "severe." *Cmty. Cancer Ctrs.*, 509 F. Supp. 3d at 500. They are, moreover, unrecoverable in any future suit for damages. *See* 5 U.S.C. § 702 (authorizing a person aggrieved by an agency action to "seek[] relief other than money damages"); *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 430 (4th Cir. 2019) (recognizing that "[t]he APA waives the federal

government's sovereign immunity for a limited set of suits," namely, those seeking relief other than money damages).  BOC's losses are therefore an irreparable injury justifying preliminary relief.

### III.  The Balance of Equities and Public Interest Favor Relief

A court weighing preliminary relief "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)).  In conducting this balancing a court "should pay particular regard for the public consequences" of its disposition. *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

The balance of equities and public interest favor granting the preliminary relief requested by BOC.  As an initial matter, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *AFL-CIO*, 771 F. Supp. 3d at 793 (citations and internal quotation marks omitted).  Entirely aside from the illegality of CMS's revocation, however, the public interest in preserving BOC's approval is especially strong, because, until recently, BOC fulfilled an vital function in the administration of Medicare Part B as one of only eight organizations approved to provide DMEPOS accreditation services.  A significant number of DMEPOS suppliers, many of them small businesses, have relied on BOC to provide the accreditation these businesses need to operate.  If BOC exits the marketplace, some businesses will suffer delays in obtaining reaccreditation, and other businesses with existing accreditations will be unable to receive support during the lifetime of their existing accreditations without reapplying for accreditation (a process that typically takes months) with another AO.  *See* Knott Decl. ¶ 18.  Any harm caused by interruptions to the business of DMEPOS suppliers will ultimately devolve on Medicare beneficiaries.

26

The need for BOC's services will become even more acute because CMS has very recently finalized a rule that will require as of January 1, 2026 reaccreditation on an annual instead of triennial basis. *See* DMEPOS Accreditation Requirements, 90 Fed. Reg. 55342, 55607 (Dec. 2, 2025) ("All accredited DMEPOS suppliers must be surveyed and reaccredited at least once every 12 months."). The public interest is not well served by eliminating from the accreditation marketplace one of only eight AOs while at the same time significantly increasing demand for accreditation services.

The equities also favor preliminary relief because a denial of relief would be catastrophic for BOC's business. CMS's "competing claims of injury," even if taken at face value, are comparatively insignificant: they consist of technical violations of the CAP that do not implicate public health or safety. *Winter*, 555 U.S. at 24.

## CONCLUSION

For the foregoing reasons, BOC respectfully requests that this Court grant the preliminary relief requested.

4929-6874-5081, v. 10

Dated:  December 16 , 2025                    Respectfully submitted,

                                           */s/  B. Summer Hughes Niazy*
                                           James P. Ulwick (Fed. Bar No. 00536)
                                           Christopher C. Jeffries (Fed. Bar No. 28587)
                                           B. Summer Hughes Niazy (Fed. Bar No. 06362)
                                           Matthew A. Haven (Fed. Bar No. 18602)
                                           Bruno Babij (Fed. Bar No. 31160)
                                           KRAMON & GRAHAM, P.A.
                                           750 East Pratt Street, Suite 1100
                                           Baltimore, Maryland 21202
                                           julwick@kg-law.com
                                           cjeffries@kg-law.com
                                           sniazy@kg-law.com
                                           mhaven@kg-law.com
                                           bbabij@kg-law.com
                                           Telephone: (410) 752-6030
                                           Facsimile: (410) 539-1269

                                           *Attorneys for Plaintiff*

4929-6874-5081, v. 10